UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MW CAPITAL FUNDING, INC.,
a Delaware corporation,

    Plaintiff,

v.

MAGNUM HEALTH AND REHAB
OF MONROE LLC, *et al.*,

    Defendants.
_____/

Case No. 16-14459

Hon. George Caram Steeh

## OPINION AND ORDER DENYING MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES' MOTION FOR SURCHARGE (DOC. 110)

Before the court is the Michigan Department of Health and Human Services' motion to declare that (1) the Receiver assumed the Defendants' Medicaid provider agreements; (2) Medicaid overpayments are administrative expenses of the Receivership estate, and (3) to surcharge to the Plaintiff, Abraham Shaulson, and the Receiver's bond. The court received extensive briefing, including supplemental briefs as requested. In that regard, MDHHS moved to strike MICHA's reply brief. For the reasons explained below, the motions are denied.

### BACKGROUND FACTS

Plaintiff MW Capital Funding, Inc. ("MW Capital"), filed a complaint

against several nursing homes -- Magnum Health and Rehab of Monroe, Saginaw, Adrian, and Hastings – for breach of a loan agreement.  Plaintiff had a security interest in the accounts and other assets of the nursing homes.  On January 4, 2017, Plaintiff obtained a consent order appointing a Receiver (Trigild, Inc.) to operate the nursing facilities.  The Receiver employed Benchmark Healthcare Consultants, LLC, as operational manager for each facility.  A consent judgment was entered in favor of Plaintiff on February 3, 2017, in the amount of $3,527,625.50.  The judgment provided that "Plaintiff shall not execute on the Judgment pending further order of this Court in furtherance of and consistent with the Receiver Order."  Doc. 10.

The Receiver, in consultation with Plaintiff, closed the Saginaw facility because of its deteriorating financial condition.  The Receiver continued operating the remaining facilities and marketed them for sale.  It received a bid ("Stalking Horse Bid") in the amount of $3,375,000 for the assets of the Adrian, Hastings, and Monroe facilities (not including the real estate, which was owned by different entities).  On May 9, 2017, the Receiver filed a motion seeking entry of an order setting certain sale procedures for a proposed auction.  MI Rosdev, a member of the entities which owned the real estate, objected to the sale order.  The court held a hearing on October

11, 2017.  Ultimately, the Stalking Horse Bid was withdrawn, and the Receiver withdrew its motion on October 31, 2017.

Plaintiff and MI Rosdev entered into negotiations regarding a sale of the facilities and the real estate together.  They represented to the Receiver at the October 11, 2017 hearing that a "deal was imminent." Doc. 39 at ¶ 8.  However, as negotiations continued, the facilities had critical cash flow deficiencies.  The Receiver filed a motion to immediately wind down operations and close the remaining facilities on March 13, 2018.  Doc. 39.  The Receiver reported that he "has made numerous requests to Plaintiff to provide funding to keep operations running and to ensure that payroll is met.  These requests have gone unfulfilled." *Id.*

The Michigan Department of Health and Human Services ("MDHHS") responded to the Receiver's motion, outlining its concerns about the facilities' inability to provide proper patient care during the wind-down process and the failure to provide sufficient notice of the closure.  Doc. 42.

On April 27, 2018, the Receiver withdrew the motion to close the facilities, because it "obtained temporary interim funding," apparently from Plaintiff or the proposed buyer in anticipation of a deal.  Doc. 46.  On May 15, 2018, MDHHS filed an emergency motion for a status conference, outlining numerous serious concerns, including that vendors were not being

paid at the facilities, the employees' health care policies were cancelled for nonpayment, and that the financial crisis was affecting patient care. Doc. 47. In response, Plaintiff agreed that the facilities should be closed and should not be permitted to operate further without funding. Doc. 55.

On May 25, 2018, the Receiver filed a motion for an expedited sale of the receivership assets to Plaintiff through a credit bid. Doc. 59. The court heard argument, including the objections of MDHHS and others, and took the matter under advisement. The matter was set for a hearing/settlement conference before Judge Friedman on June 13, 2018. At the conference, the parties agreed to a sale order (except for MDHHS, which did not have a person with authority present, contrary to the court's order). Docs. 81, 117.

On June 13, 2018, the court entered an "Order Authorizing and Approving the Expedited Sale of the Operating Receivership Assets Free and Clear of All Liens, Claims, Interests and Encumbrances" ("Sale Order"). Doc. 81. Around the same time, MW Capital assigned its debt to MICHA US, LLC. In the Sale Order, the court granted MICHA "the exclusive right to acquire the Operating Receivership Assets," subject to certain liabilities, including the expenses incurred by the Receivership. *Id.* at ¶ 1. The Sale Order provides, however, that MICHA does not have "any financial liability whatsoever for amounts due or alleged to be due to the

Michigan Department of Health and Human Services" arising from the operation of the nursing homes during the receivership. Doc. 81 at ¶ 11 ("Medicaid Liabilities").

The Sale Order provided for the closing of the sale of the Operating Receivership Assets after certain regulatory approvals ("Pre-Closing Approvals") were obtained. *Id.* at ¶ 6. The closing occurred on October 1, 2018. The facilities are now owned by Monroe MI SNF Management LLC; Adrian MI SNF Management LLC; and Hastings MI SNF Management LLC ("the Purchaser Opcos"), which are affiliates of MICHA (which is an affiliate of MI Rosdev). Although the facilities are now operated by the Purchaser Opcos, the Receiver continues to manage the Receivership Estate pending discharge.

MDHHS alleges that the Receivership Estate owes the state approximately $1.5 million for Medicaid overpayments made between January 4, 2017, and September 30, 2018. The Medicaid overpayments sought are the difference between the Medicaid reimbursements received by the nursing homes during the period of the Receivership and the amount MDHHS subsequently determined they should have received after an audit.

As part of its acquisition of the Operating Receivership Assets, MICHA agreed to pay the expenses of the Receivership Estate, as well as

certain quality assurance assessments due to MDHHS. MICHA expressly declined to take responsibility for the Medicaid overpayments at issue here. Doc. 81 at ¶ 11. MDHHS seeks to hold MW Capital, as the party who sought the receivership, liable for the Medicaid overpayments.

MDHHS contends that the Medicaid overpayments are administrative expenses of the estate that should be charged to MW Capital and its president, Abraham Shaulson, because Plaintiff improperly sought the receivership. In supplemental briefing requested by the court, MDHHS further argues that the court should surcharge the proceeds from MW Capital's security interest in the amount of the overpayments because the plaintiff benefited from the overpayments and because MW Capital consented to the receivership. MDHHS also seeks to surcharge the Receiver's bond.

## LAW AND ANALYSIS

In presiding over an equity receivership, a district court has "broad powers and wide discretion." *SEC v. Basic Energy & Affiliated Res., Inc.*, 273 F.3d 657, 668 (6th Cir. 2001) (quoting *SEC v. Elliott*, 953 F.2d 1560, 1566 (11th Cir. 1992)). "Receivership is an equitable remedy, and the district court may, in its discretion, determine who shall be charged with the costs of the receivership." *Gaskill v. Gordon*, 27 F.3d 248, 251 (7th Cir.

1994); *see also Elliott*, 953 F.2d at 1576 ("The district court appointing the receiver has discretion over who will pay the costs of the receiver.").

I. <u>Abraham Shaulson</u>

MDHHS seeks to hold Abraham Shaulson, whom it alleges is the "sole member" of MW Capital, personally liable for the Medicaid overpayments. Shaulson responds that he is the president of MW Capital, but that he has no economic interest in the corporation. Regardless, Shaulson is not a party to this action and, as a result, the court lacks jurisdiction over him. *See Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. 100, 110 (1969) ("It is elementary that one is not bound by a judgment in personam from litigation in which he is not designated as a party or to which he has not been made a party by service of process."). Although MDHHS argues that the court could obtain personal jurisdiction over Shaulson under Michigan's long-arm statute, such a maneuver skips the required step of naming Shaulson as a party and serving him with process. "Due process requires proper service of process for a court to have jurisdiction to adjudicate the rights of the parties." *O.J. Distrib., Inc. v. Hornell Brewing Co.*, 340 F.3d 345, 353 (6th Cir. 2003). The court will deny MDHHS's motion with respect to Shaulson.

II. <u>Wrongful Receivership</u>

"A district court enjoys broad equitable powers to appoint a receiver over assets disputed in litigation before the court. The receiver's role, and the district court's purpose in the appointment, is to safeguard the disputed assets, administer the property as suitable, and to assist the district court in achieving a final, equitable distribution of the assets if necessary." *Liberte Capital Grp., LLC v. Capwill*, 462 F.3d 543, 551 (6th Cir. 2006). In receivership cases, "the federal courts exercise the traditional, common law powers of equity." *Id.; see also* Fed. R. Civ. P. 66; *Canada Life Assur. Co. v. LaPeter*, 563 F.3d 837, 842 (9th Cir. 2009) (federal law governs appointment of receiver in diversity cases).

MDHHS argues that the receivership imposed here was wrongful and that MW Capital should essentially be sanctioned for seeking it. "When a receivership is improper or the court lacks equitable authority to appoint a receiver, the party that sought the receivership at times has been held accountable for the receivership fees and expenses." *Netsphere, Inc. v. Baron*, 703 F.3d 296, 311-12 (5th Cir. 2012) (court lacked authority to appoint receiver). MDHHS contends that MW Capital did not legitimately fear that its collateral was at risk and sought the receivership to gain

leverage in a corporate battle between Shaulson and Rosdev.[1]

The court is doubtful that a non-party creditor like MDHHS has standing to challenge the imposition of a receivership.[2] MDHHS was not directly harmed by the *imposition* of the receivership, which affected *Defendants'* assets. See *American Dev. Corp. v. Strack*, 81 F.3d 167 at *3 (9th Cir. 1996) (party with contractual relationship with company under receivership did not have standing to challenge appointment of receiver); *Netsphere*, 703 F.3d at 311-12 ("[T]he *parties whose property has been wrongfully seized* are entitled, on equitable principles, to recover costs from those who have wrongfully provoked the receivership.") (citation omitted). A judicial ruling vacating the receivership order would not redress MDHHS's injury, which resulted from the lack of unencumbered assets in the Receivership Estate and the terms of the Sale Order, not the

---

[1] *See* Doc. 110 at 12-15. Shaulson and Rosdev were both members of an LLC, MI Property Holdings, which owned the properties that the Defendant nursing homes leased. *See* Doc. 19 at 2-3. Rosdev objected to Shaulson's plan to sell the real property owned by MI Property Holdings and filed suit to demand arbitration. *See MI Rosdev Property LP v. Shaulson*, 16-12588, Doc. 1. The suit was dismissed by the court because the parties agreed to arbitrate. *Id.* at Doc. 24. Subsequently, MW Capital filed this action and sought a receiver for the nursing homes, which did not own the buildings or property where the facilities were located.

[2] Standing requires that a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

appointment of the Receiver.

Further, it is clear from the record that MW Capital was entitled to the equitable remedy of a receiver, to which Defendants consented. Defendants were in default on their loans from MW Capital. It is undisputed that MW Capital had a first priority security interest in Defendants' assets and that Defendants also owed millions in unpaid rent to their landlords.[3] The security agreement gave MW Capital the right to seek a receiver in the event of a loan default. An operating receivership, followed by a sale, was clearly preferable to immediate foreclosure for all involved, especially the nursing home residents who would have been abruptly and involuntarily displaced. The dire financial condition of the Defendants was confirmed during the Receivership, when the Receiver filed an emergency motion seeking closure of the facilities due to the lack of cash flow to maintain basic services.

Under the circumstances, it is not apparent to the court that MW Capital or Shaulson's alleged motivation in seeking the receivership has

---

[3] MDHHS contends that MW Capital was not candid with the court regarding its alleged fear of that the nursing homes were in jeopardy of being evicted, given that Shaulson was both President of MW Capital and the managing member of the land owners. MDHHS argues that the landlords were unlikely to evict the nursing homes, as such a move would reduce the value of both the nursing homes and the underlying property. It is undisputed, however, that the nursing homes were unable to pay their rent, underscoring their precarious financial condition. Moreover, the receivership order was not based upon this alleged fear of eviction, but upon Defendants' consent.

any bearing on its propriety. The court declines to sanction MW Capital under the theory that it wrongfully sought the receivership.

   III.   Surcharge Proceeds of Collateral

In supplemental briefing requested by the court, MDHHS argues that the proceeds from MW Capital's collateral should be surcharged in the amount of the Medicaid overpayments, which it contends are administrative expenses of the receivership estate. *See U.S. v. F.D.I.C.*, 899 F. Supp. 50, 54-57 (D. R.I. 1995). For the purposes of this analysis, the court will assume that the Medicaid overpayments are administrative expenses.[4] Generally, administrative expenses are charged against the fund or property in the receivership estate. *Id.* When funds are insufficient to pay all claims, secured claims take priority over administrative expenses. *Id.; see also Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 5 (2000) (in bankruptcy "administrative expenses . . . do not have priority over secured claims").

However, the court may surcharge a secured creditor's collateral for administrative expenses under limited circumstances. For example, "[t]he court in equity may award the receiver fees from property securing a claim

---

[4] MW Capital and the Receiver dispute that the Medicaid overpayments are operating or other administrative expenses of the Receivership Estate. They also dispute the amount due.

- 11 -

if the receiver's acts have benefitted the property." *Elliott*, 953 F.2d at 1576. "A receivership lien may also be appropriate if the prior lienor acquiesced to the receivership." *Gaskill*, 27 F.3d at 251. *See also Iowa Dep't of Human Servs. v. Community Care, Inc.*, 861 N.W.2d 868, 874-75 (Iowa 2015) ("Around the country, the general rule is that receivership expenses may be paid out of encumbered property only to the extent the lien creditor benefits from or consents to the receivership."); *S. Cnty. Sand & Gravel Co. v. Bituminous Pavers Co.*, 108 R.I. 239 (1971) ("[A] judicial rule has evolved which permits receivership expenses to be taxed against encumbered property when the secured creditor or his property has been benefited or otherwise advantaged by receivership proceedings and then only in proportion to the extent of the benefit or advantage conferred.").

MDHHS argues that the Medicaid overpayments, as a source of income for the nursing homes, allowed them to continue operating and to be sold as going concerns, thus conferring a benefit upon MW Capital, which was able to sell its debt to MICHA. As discussed below, this is not the type of direct benefit that typically justifies a surcharge of collateral.

When determining whether a surcharge is appropriate in a receivership proceeding, courts may look to bankruptcy law for guidance. *See F.D.I.C.*, 899 F. Supp. at 54. Under the Bankruptcy Code, a court may

surcharge a secured creditor's collateral for administrative expenses that fall under § 506(c), as opposed to general administrative expenses that fall under § 503(b)(1)(B), which are paid with unencumbered funds. *See* 11 U.S.C. §§ 503, 506. Section 506(c) provides that the "trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim." *Id.*[5] This section "constitutes an important exception to the rule that secured claims are superior to administrative claims." *Hartford Underwriters*, 530 U.S. at 5.

To recover under § 506(c), the trustee must show that the expenses were reasonable, necessary, and provided a direct benefit to the secured creditor. *See In re Cascade Hydraulics and Utility Serv., Inc.*, 815 F.2d 546, 548 (9th Cir. 1987); *In re Ferncrest Court Partners Ltd.*, 66 F.3d 778 (6th Cir. 1995). "To satisfy the benefit test of section 506(c), [the debtor] must establish in quantifiable terms that it expended funds directly to protect and preserve the collateral." *Cascade Hydraulics*, 815 F.2d at 548. In addition,

---

[5] MW Capital correctly points out that a § 506(c) surcharge may only be sought by the trustee in bankruptcy. *See Hartford Underwriters*, 530 U.S. at 6. MW Capital argues that only the receiver should be able to pursue such a claim here. Although the court looks to § 506(c) for guidance, it is not proceeding under the Bankruptcy Code. It is not clear that the statutory language limiting relief to the trustee applies here, where the court has broad discretion in presiding over an equity receivership. Because the court finds that a surcharge is not otherwise appropriate, it need not decide this issue.

recovery "is limited to the extent that the secured creditor benefited from the services. Section 506(c) is not intended as a substitute for the recovery of administrative expenses normally the responsibility of the debtor's estate." *Id.* (citation omitted). "Typical costs allowed by courts include 'appraisal fees, auctioneer fees, moving expenses, maintenance and repair costs, and advertising costs.' These costs are justified because they are expended to protect or preserve the property." *F.D.I.C.*, 899 F. Supp. at 55.

MDHHS argues that MW Capital received a benefit, because the Medicaid overpayments provided income to the nursing homes that allowed them to operate as going concerns and thus retain their value.[6] MDHHS contends that without a steady stream of Medicaid payments, the nursing homes would not have been able to operate. We may surmise that the nursing homes would have had difficulty operating without access to any Medicaid payments at all. MDHHS is not seeking to recover *all* such payments, however, but only the amount it has subsequently determined was *overpaid*. It is not clear what benefit MW Capital received from the

---

[6] Perhaps because the analogy to § 506(c) expenses is imperfect, MDHHS has not articulated how the Medicaid overpayments are reasonable and necessary expenses.

overpayments, let alone whether the benefit would be equivalent to the approximately $1.5 million sought by MDHHS. MDHHS falls short of the required showing "in quantifiable terms" that the Medicaid overpayments directly protected and preserved MW Capital's collateral. *See Cascade Hydraulics*, 815 F.2d at 548. *Cf. In re Domistyle, Inc.*, 811 F.3d 691, 701 (5th Cir. 2015) (testimony from real estate broker that "the value preserved was at least as much as the amount expended").

Indeed, "general assertions" that a secured creditor benefited from the operation of a business are insufficient. *Cascade Hydraulics*, 815 F.2d at 548. A party seeking surcharge "does not satisfy her burden of proof by suggesting hypothetical benefits." *Id.; see also In re Flagstaff Foodservice Corp.*, 762 F.2d 10, 12 (2d Cir. 1985) (rejecting debtor's argument that because reorganization helped preserve going concern value of business, secured creditor should be surcharged for payroll taxes); *F.D.I.C.*, 899 F. Supp. at 56 (rejecting argument that capital gains tax was a § 506(c) expense because it did not serve to directly protect and preserve the collateral); *In re K & L Lakeland, Inc.*, 128 F.3d 203, 211 (4th Cir. 1997) (claim of benefit derived from continued operation of business insufficient to support § 506(c) surcharge for rent); *Cascade Hydraulics*, 815 F.2d at 547-48 (no surcharge for telephone expense, federal withholding taxes, social

security taxes, attorneys fees and executive compensation). *Cf. Gaskill*, 27 F.3d at 251 (receiver's fee given priority over secured claim because receivership benefited property); *Cagan v. Mutual Benefit Life Ins. Co.*, 28 F.3d 654, 656 (7th Cir. 1994) (cost of property improvements given priority); *In re AFCO Enter., Inc.*, 35 B.R. 512, 515 (D. Utah 1983) (evidence demonstrated that trustee's fee and expenses in operating resort preserved going concern value, which benefited secured creditor).

As one court explained, "[s]ection 506(c) was not intended to encompass ordinary administrative expenses that are attributable to the general operation and dissolution of an estate in bankruptcy. Rather, it was designed to extract from a particular asset the cost of preserving or disposing of that asset." *F.D.I.C.*, 899 F. Supp. at 56 (citation omitted). MDHHS has not sufficiently demonstrated that the Medicaid overpayments provided a direct, quantifiable benefit to MW Capital by preserving its collateral. The court declines to surcharge MW Capital on that basis.

MDHHS also argues that surcharge is appropriate because MW Capital sought and consented to the receivership. Some courts have charged the party seeking or consenting to a receivership with the receiver's compensation and expenses, on the theory that the party "benefits from the property having been protected and preserved" by the

receiver. *See Fisk v. Fisk*, 333 Mich. 513, 516 (1952); *Bailey v. Bailey*, 262 Mich. 215, 218-20 (1933). Although a party seeking a receivership may implicitly agree to pay the receiver's compensation and expenses, it does not necessarily follow that this agreement extends to the payment of expenses like the Medicaid liabilities here, which have not been shown to benefit the secured creditor. *See, e.g., F.D.I.C.*, 899 F. Supp. at 56 ("While courts recognize that a creditor's consent to appointment of a receiver may create liability for the receiver's expenses that may be deducted from the creditor's proceeds of collateral, this reasoning has never been extended to include a capital gains tax."); *Gaskill*, 27 F.3d at 251 ("Illinois law specifically provides that a receiver's lien may be a superior lien on mortgaged property, so long as the receivership *benefited* the property and the mortgagee acquiesced in, or failed to object to, the receivership.").

Moreover, the Supreme Court has held that consent alone does not render a plaintiff liable for receivership expenses:

> [T]he general rule should be applied which makes such expenses a charge upon the property or fund under the control of the court, without any personal liability therefor upon the part of the plaintiff, who invoked the jurisdiction of the court. The mere inadequacy of the property or fund to meet such expenses constitutes in itself no reason why liability should be fastened upon the plaintiff, who has been guilty of no irregularity, and who, so far from seeking any improper advantage, has succeeded in his suit by

receiver. *See Fisk v. Fisk*, 333 Mich. 513, 516 (1952); *Bailey v. Bailey*, 262 Mich. 215, 218-20 (1933). Although a party seeking a receivership may implicitly agree to pay the receiver's compensation and expenses, it does not necessarily follow that this agreement extends to the payment of expenses like the Medicaid liabilities here, which have not been shown to benefit the secured creditor. *See, e.g., F.D.I.C.*, 899 F. Supp. at 56 ("While courts recognize that a creditor's consent to appointment of a receiver may create liability for the receiver's expenses that may be deducted from the creditor's proceeds of collateral, this reasoning has never been extended to include a capital gains tax."); *Gaskill*, 27 F.3d at 251 ("Illinois law specifically provides that a receiver's lien may be a superior lien on mortgaged property, so long as the receivership *benefited* the property and the mortgagee acquiesced in, or failed to object to, the receivership.").

Moreover, the Supreme Court has held that consent alone does not render a plaintiff liable for receivership expenses:

> [T]he general rule should be applied which makes such expenses a charge upon the property or fund under the control of the court, without any personal liability therefor upon the part of the plaintiff, who invoked the jurisdiction of the court. The mere inadequacy of the property or fund to meet such expenses constitutes in itself no reason why liability should be fastened upon the plaintiff, who has been guilty of no irregularity, and who, so far from seeking any improper advantage, has succeeded in his suit by

receiver. *See Fisk v. Fisk*, 333 Mich. 513, 516 (1952); *Bailey v. Bailey*, 262 Mich. 215, 218-20 (1933). Although a party seeking a receivership may implicitly agree to pay the receiver's compensation and expenses, it does not necessarily follow that this agreement extends to the payment of expenses like the Medicaid liabilities here, which have not been shown to benefit the secured creditor. *See, e.g., F.D.I.C.*, 899 F. Supp. at 56 ("While courts recognize that a creditor's consent to appointment of a receiver may create liability for the receiver's expenses that may be deducted from the creditor's proceeds of collateral, this reasoning has never been extended to include a capital gains tax."); *Gaskill*, 27 F.3d at 251 ("Illinois law specifically provides that a receiver's lien may be a superior lien on mortgaged property, so long as the receivership *benefited* the property and the mortgagee acquiesced in, or failed to object to, the receivership.").

Moreover, the Supreme Court has held that consent alone does not render a plaintiff liable for receivership expenses:

> [T]he general rule should be applied which makes such expenses a charge upon the property or fund under the control of the court, without any personal liability therefor upon the part of the plaintiff, who invoked the jurisdiction of the court. The mere inadequacy of the property or fund to meet such expenses constitutes in itself no reason why liability should be fastened upon the plaintiff, who has been guilty of no irregularity, and who, so far from seeking any improper advantage, has succeeded in his suit by

> obtaining the relief asked, -- namely, a decree of foreclosure and sale.

*Atlantic Tr. Co. v. Chapman*, 208 U.S. 360, 376 (1908).

Viewing the totality of the circumstances, the court does not find it equitable to displace MW Capital's priority and order payment of the Medicaid overpayments from the proceeds of its collateral, when it has not been shown that MW Capital directly benefited or was unjustly enriched. The court will apply the general rule that a secured claim has priority over administrative expenses such as those sought by MDHHS.

IV. <u>Surcharge Receiver's Bond</u>

MDHHS contends that the Receiver negligently operated the nursing homes and that the Receiver's bond should be surcharged as a result. MDHHS posits that the Receiver delayed in seeking guidance from the court and unreasonably relied on Plaintiff's assurances that operational funds were forthcoming or that a deal between Plaintiff and Rosdev was imminent. MDHHS argues that the Receiver "negligently continued operating without ensuring adequate and proper funding." Doc. 120 at 12.

The Receiver responds that it did not unreasonably rely on Plaintiff's assurances, as Plaintiff had provided operational funding earlier in the Receivership. Further, the Receiver avers that once Plaintiff stated it would no longer provide funds, the Receiver immediately sought permission from

- 18 -

the court to close the facilities. This ultimately led to an agreement between Plaintiff and Rosdev, culminating in the Sale Order.

MDHHS has not articulated how it was harmed by the Receiver's alleged negligence, or how a different approach on the part of the Receiver would have served to avoid any such harm. Assuming the Receiver sought permission to close the facilities sooner, it does not follow that there would be funds in the Receivership Estate to pay MDHHS. Willing buyers were scarce. See Doc. 173 at 16-26. The eventual outcome of a negotiated sale, allowing the facilities to continue to operate, was clearly preferable to an abrupt closure, which would have displaced vulnerable residents and likely left no excess funds to satisfy the Medicaid liabilities or Receivership expenses. *Id.* at 32 (discussing value of nursing home licenses if sold upon liquidation). MDHHS has not demonstrated that the Receiver was negligent or that it was harmed by the Receiver's actions. The court finds no basis to surcharge the Receiver's bond on behalf of MDHHS.

## CONCLUSION

It is the court's view that the Sale Order represented the best possible outcome for the Receivership Estate and the interested parties, including the nursing home residents. Considering the totality of the circumstances, the court does not find an equitable or legal basis to surcharge MW Capital,

Abraham Shaulson, or the Receiver's bond to satisfy the Medicaid liabilities.  Accordingly, IT IS HEREBY ORDERED that MDHHS's motion to surcharge (Doc. 110) is DENIED.

IT IS FURTHER ORDERED that MDHHS's motion to strike MICHA's reply brief (Doc. 164) is DENIED.

Dated:  July 31, 2019

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record  on July 31, 2019, by electronic and ordinary mail.

s/Marcia Beauchemin
Deputy Clerk